IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

CARL MAURICE HAYES                    )
                                      )
v.                                    )        Case No. 3:13-1148
                                      )        Judge Sharp/Bryant
SOCIAL SECURITY ADMINISTRATION        )


To:    The Honorable Kevin Sharp, Chief Judge


## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to

obtain judicial review of the final decision of the Social Security Administration ("SSA" or

"the Administration") denying plaintiff's applications for disability insurance benefits and

supplemental security income, as provided under Titles II and XVI of the Social Security Act.

The case is currently pending on plaintiff's motion for judgment on the administrative record

(Docket Entry No. 14), to which defendant has responded (Docket Entry No. 17).  Upon

consideration of these papers and the transcript of the administrative record (Docket Entry

No. 12),[1] and for the reasons given below, the undersigned recommends that plaintiff's

motion for judgment be DENIED and that the decision of the SSA be AFFIRMED.


## I.  Introduction

Plaintiff filed his applications for benefits in November 2009, alleging

disability onset as of March 5, 2009 (Tr. 159-67)  His applications were denied at the initial

---

[1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

and reconsideration stages of state agency review. Plaintiff subsequently requested *de novo* review of his case by an Administrative Law Judge (ALJ). The case came to be heard by the ALJ on May 1, 2012, when plaintiff appeared with counsel and gave testimony. (Tr. 35-73) Testimony was also received from an impartial vocational expert. At the conclusion of the hearing, the ALJ took the matter under advisement until May 17, 2012, when she issued a written decision finding plaintiff not disabled. (Tr. 18-30) That decision contains the following enumerated findings:

1.  The claimant meets the insured status requirements of the Social Security Act through March 31, 2010.

2.  The claimant has not engaged in substantial gainful activity since March 5, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: Gall Bladder Disorder; Degenerative Joint Disease, left knee; Degenerative Disc Disease, lumbar spine; Hypertension; Obesity; Diabetes Mellitus; Residuals, remote gunshot wound to abdomen, by history (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), including the ability to lift and/or carry 20 pounds occasionally and 10 pounds frequently, except as follows: He may stand and/or walk for two hours, and sit for six hours, and is further limited to jobs that involve no climbing of ladders, ropes or scaffolds, with no crouching or crawling, with no more than occasional kneeling or climbing of ramps and stairs. In addition to the foregoing, the claimant requires a cane for balancing and would be better with a sit/stand option.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565

and 416.965).

7.     The claimant was born on October 23, 1967 and was 41 years old, which is defined as a younger individual (age 18-49), on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the regional and national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from March 5, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 20, 22-23, 27-29)

        On August 13, 2013, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 5-7), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

        The following summary of the medical evidence in this case is taken from

plaintiff's brief, Docket Entry No. 14 at pp. 3-9:

On October 5, 2009, Mr. Hayes presented to Nashville General Hospital at Meharry with complaints of left knee pain (as well as left shoulder pain) which had been worsening over the prior five or six years. Tr. 223. Mr. Hayes rated his pain as an 8 out of 10, and he reported constipation and high blood pressure, as well as falling within the last month. Tr. 223-226. He was also noted to have uncontrolled hypertension with a blood pressure of 171/96. Id. He was referred to an orthopedist. Tr. 223.

Mr. Hayes was then treated by Dr. Limbird, an orthopedic surgeon, on October 22, 2009, related to his knee impairments and related symptoms. Tr. 221. He reported his symptoms had progressed to the point that he was unable to get up and down steps, he could not walk very far, it occasionally locks and catches, and it wakes him up at night largely because of pain. Id. Dr. Limbird's physical examination revealed a decided wind blown deformity to his legs with almost 25 degrees of varus in his left knee, and about 7 or 8 degrees of valgus on his right. Id. Dr. Limbird also noted that he has very large knees, medial joint line tenderness and crepitance, and he could not passively correct the deformity. Id. He also noted Mr. Hayes was 5 feet 7 inches tall with a weight of 373 pounds. Id.

Dr. Limbird noted that "standing films of his knees show complete medial collapse with bone on bone changes, significant tibia vara as well as medial collapse." Id. Specifically, x-rays revealed severe osteoarthritic changes of the left knee with compartment narrowing and osteophyte formation, as well as questionable suprapatellar joint space osteocartilaginous body. Tr. 222. Dr. Limbird further stated that he did not have much to offer Mr. Hayes, and the only thing that would really help his knee would be to get the weight off of the medial side of his knee. Tr. 221. Dr. Limbird stated that an osteotomy

would be appropriate for this, but that Mr. Hayes needed to lose about 100 to 125 pounds in order to make him a better surgical candidate. Id. Dr. Limbird stated that getting weight off his knee would help make a difference in how his knee feels, but it would not change how his knee is aligned. Id.

Mr. Hayes returned to Meharry in December 2009 for refills of his hypertension medications, and he continued to complain of knee pain rated as a 9 out of 10 with insufficient relief from his medications. Tr. 245. He was diagnosed with uncontrolled hypertension, degenerative joint disease of the knee (with referral to Dr. Limbird noted), and morbid obesity, and his medications were adjusted in an attempt to better control his symptoms and pain. Tr. 247. He was again seen in January 2010 related to constipation which was felt to be related to his prescribed narcotic pain medications. Tr. 249-253.

On January 14, 2010, Mr. Hayes presented to Dr. Bruce Davis for a consultative medical examination at the request of SSA. Tr. 228-229. Dr. Davis provided a limited report, although he did note examination findings of lower back pain with decreased range of motion, back and knee pain with slow position changes, reduced left hip range of motion, and positive straight leg raise testing at 70 degrees. Tr. 228. His examination also revealed left knee pain, tenderness, mild swelling, crepitus with slow knee flexion, decreased flexion and extension, and gait limp with incomplete gait maneuver attempts. Id. Dr. Davis also noted that Mr. Hayes' "treatment includes position changes, rest/leg elevation, heat, rub, medications (Tramadol, Toradol, Indocin), brace (wearing), physician specialist visits, [and] walking stick (brought)." Id.

Mr. Hayes returned to Dr. Limbird on February 2, 2010, and he reported that his left knee continues to hurt him all the time, and his medications did no good. Tr. 254. Dr.

Limbird noted that he had a "horribly collapsed knee," but that he still weighed 362 pounds, which was certainly not enough to make his needed surgery practical. Id. Dr. Limbird referred him to his medical doctor for assistance losing weight, and stated that there was very little else he could offer at the time. Id.

On February 22, 2010, Mr. Hayes returned to Meharry with complaints of muscle cramps and spasms in his leg and back, and he again rated his pain as an 8-9 out of 10. Tr. 255. He reported that the pain had awakened him from sleep, he had fallen in early February due to his left knee, his pain was not relieved with medications, and cramping occurred "out of the blue." Id. He also reported weakness and fatigue, as well as blurry vision, ankle edema, hypertension, constipation and polyuria, and he was using a walking stick for ambulation. Tr. 255-256. X-rays of his lumbar spine revealed multilevel degenerative disc disease and disc space narrowing with lateral and anterior osteophytes throughout the lumbar spine, as well as osteopenia and metallic gunshot pellets in the right lower quadrant consistent with remote gunshot injury. Tr. 259.

Mr. Hayes again returned to Meharry in May 2010 with ongoing complaints of muscle spasms which had been persisting for several months. Tr. 326. He rated his pain to be a 7 out of 10, and he reported falling twice during the prior month. Tr. 326, 329. He was assessed with muscle cramps and hypertension. Tr. 326. On August 19, 2010, Mr. Hayes returned with complaints of numbness for the prior two months in his left shoulder, arm and two fingers. Tr. 319. He rated his pain as an 8 out of 10, and again reported falling within the prior month. Tr. 319-325. He was assessed with osteoarthritis, COPD, hypertension, and something else which is difficult to make out. Tr. 319. Mr. Hayes returned on September 22, 2010, and again complained of persistent left arm pain and swelling with redness and

weakness. Tr. 314. He was noted to have associated warmth over the left upper extremity and reduced use. <u>Id</u>. He rated his pain as a 9 out of 10, and again reported falling within the prior month. Tr. 317.

Mr. Hayes was admitted on September 27, 2010, related to his left arm pain, numbness, and swelling, and he reported persistent symptoms despite some improvement in the swelling on the medications. Tr. 308, 311. Physical examination revealed swelling of his left upper extremity with erythema and tenderness. Tr. 312. He was diagnosed with left arm cellulitis and rule out fasciitis, and an MRI was ordered, along with STAT vancomycin. <u>Id</u>. Due to Mr. Hayes' size, the MRI had to be cancelled, but he was commenced on vancomycin and piperacillin/tazobactam, and the swelling improved significantly by the third day of admission. Tr. 308-309. He was also diagnosed with new onset diabetes, and labs revealed a glucose level of 206 with hemoglobin A1c of 7.8%. <u>Id</u>. His diagnoses also included hypertension, chronic back pain, and morbid obesity (body mass index of 54.7). Mr. Hayes called soon thereafter to report that his metformin was causing severe abdominal pain and cramping which were intolerable. Tr. 307. Due to the potential for weight gain as a side effect of other medications, a trial of Januvia was elected going forward. <u>Id</u>.

Mr. Hayes returned to Meharry for follow-up after this hospitalization in October 2010, and he reported that the swelling of his arm had improved. Tr. 303. However, he reported persistent pain and muscle spasms all over his back and legs. <u>Id</u>. He was diagnosed with uncontrolled diabetes, hypertension, resolved cellulitis of the left arm, and indigent patient. <u>Id</u>. It was noted that his blood sugar was 135 despite fasting all day. Tr. 305. In November 2010, he returned for treatment of an abscess around his right eye with pain and swelling, which was incised and drained. Tr. 291-302.

On December 20, 2010, Mr. Hayes returned to Meharry for treatment related to his right knee pain which had been worsening. Tr. 287. He also complained of uncontrolled hypertension and worsening knee and back pain which he rated as a 10 out of 10. Tr. 287-290. He was diagnosed with knee arthritis, severe with fall, uncontrolled hypertension, and diabetes, and was again referred to an orthopedist for evaluation of knee arthroplasty. Tr. 289. In addition, his dosage of tramadol was increased and glyburide was added in attempt to control his diabetes and pain. Tr. 289.

On January 18, 2011, Mr. Hayes presented to another orthopedist, Dr. Jeralyn Allen, regarding his persistent bilateral knee pain. Tr. 285. X-rays of his knees revealed severe medial compartment space narrowing on the left with valgus angular deformity and moderate osteophyte formation, as well as a calcific density superior to the patella which may represent intraarticular loose body. Tr. 286. They also revealed osteopenia of the right knee with tricompartmental space narrowing and osteoarthritic changes. Id. Dr. Allen noted that Mr. Hayes had complete bone on bone osteoarthritis of both knees, as well as bone deformity of the left knee. Tr. 285. Dr. Allen also noted that he had large knees with crepitus and significant tenderness along the joint line of both knees. Id. Finally, Dr. Allen noted that surgical intervention was not feasible until he could lose at least 50-60 pounds, and she gave him a steroid injection with instructions to follow up with his primary care physician. Id.

On March 21, 2011, Mr. Hayes returned with persistent complaints of bilateral knee pain, as well as generalized body cramps and pain. Tr. 271, 381. He reported his pain was an 8 out of 10, and he had fallen within the prior month. Tr. 272. He was prescribed prednisone and referred to a pain clinic. Tr. 271. He again returned on July 18, 2011, with complaints of persistent pain in his back and knees rated to be an 8 out of 10, without relief

from tramadol. Tr. 376. He described the pain and constant, sharp, stabbing pain aggravated by movement and relieved by rest, and again reported falling within the prior month. Tr. 376, 379. Id.

On August 30, 2011, Dr. Paul Talley, Mr. Hayes' treating physician at Meharry, completed a Medical Source Statement (Physical) regarding Mr. Hayes' impairments and resulting limitations. Tr. 265-270. Dr. Talley assessed Mr. Hayes with limitations to lifting twenty pounds occasionally and no weight frequently, and sitting four hours, standing two hours, and walking one hour throughout an eight hour workday, with the need to rest the remaining hour of the eight hour workday. Tr. 265-266. Dr. Talley noted that he requires the use of a cane for ambulation, and he can only ambulate about a half-block without the use of a cane. Tr. 266. Dr. Talley also limited Mr. Hayes to only occasional overhead reaching and pushing/pulling with his upper extremities, frequent reaching in other directions, only occasional use of his lower extremities for foot controls, occasional climbing stairs and ramps, balancing, stooping and crouching, and never climbing ladders or scaffolds, kneeling or crawling. Tr. 267-268. Dr. Talley cited physical examination findings, laboratory tests, and x-rays as support for his assessment. Tr. 266-268.

Dr. Talley also completed a Medical Source Statement (Mental) on August 30, 2011. Tr. 262-264. He assessed Mr. Hayes with moderate mental limitations in all areas of mental, work related activities, and cited his constant pain as the basis for this assessment. Id.

On September 15, 2011, Mr. Hayes returned to Meharry with complaints of knee pain in his bilateral knees, and he was apparently experiencing increase in his right knee pain. Tr. 364-365. He was noted to have horrible pain, rated as an 8 out of 10, which was described as sharp, deep and constant. Tr. 365. He was given Vicodin for his pain and

prescribed Lortab with discharge instructions on home comfort measures, including heat, wrapping, resting without weight bearing and elevation. Tr. 365-368.

Mr. Hayes returned on November 1, 2011, with complaints of left shoulder, neck, lower back, and knee pain. Tr. 360. He again rated his pain as an 8 out of 10, with difficulty sleeping and minimal relief from medications. Id. He also reported numbness from his left shoulder through his first two fingers with decreased grip, as well as occasional leg swelling and shortness of breath after walking half a block (with use of a cane for ambulation). Id. On exam, he was noted to have limited abduction of the left shoulder, reduced strength (4/5) of the left arm, and decreased sensation to soft touch from the shoulder through the first two fingers on the left. Tr. 362. Mobic was added to his medication regimen. Id.

On December 6, 2011, Mr. Hayes returned with persistent symptoms similar to the prior month, including pain rated as an 8 out of 10 which was relieved by elevating his legs or sitting in a warm bath. Tr. 356. Indomethacin (Indocin) was added to his medication regimen in an attempt to help relieve his pain. Tr. 358. Mr. Hayes then was admitted in February 2012 related to severe right ear pain due to acute otomastoiditis. Tr. 336-355. He finally returned on April 10, 2012, with persistent complaints of significant bilateral knee pain, left worse than right, and stated it felt like his knee joints were grinding against each other. Tr. 330. He stated that he was unable to bear the pain when walking, waking up in the morning, or falling asleep at night. Id. He was diagnosed with bilateral knee pain, morbid obesity, hypertension and diabetes mellitus. Id.

The following summary of the testimonial evidence is taken from defendant's

brief, Docket Entry No. 17 at pp. 5-7:

On May 1, 2012, Plaintiff testified that he was fired from his last job due to customer complaints and that, but for being fired, he would have stayed at the job (Tr. 44). Plaintiff testified that he had been seeing Dr. Talley for three years about every three months (Tr. 52). Plaintiff stated that his doctor told him to lose weight before the doctor would attempt knee replacement. Id. At the time, Plaintiff was dieting but was not exercising. Id. Plaintiff was also told that he needed to stop smoking because his heart is "not expanding on one side" (Tr. 50). He has cut back but has not quit smoking. Id. He also testified that he believed he was disabled because 95% of the jobs he had were in the restaurant business and required a lot of moving at a fast pace, which he cannot do because of his knee and his back (Tr. 51). Plaintiff cannot do a lot of sitting or standing because he gets muscle spasms in his back and legs. Id. Plaintiff testified that he was seeing Dr. Tally for almost three years about every three months (Tr. 51-52).

Plaintiff lived with his niece, did not drive, and never had a driver's license (Tr. 45-47). Watching television and washing dishes were Plaintiff's primary activities (Tr. 49). Walking was difficult (Tr. 48). When seated in the same spot for too long, Plaintiff hurts and has muscles spasm (Tr. 49). His medications make him drowsy (Tr. 53).

Plaintiff testified that he can sit for about an hour-and-a half before needing to stand or adjust and he can stand for about 15 minutes (Tr. 52). While he can walk for 20 minutes, he walks a little, then has to stop and rest to catch his breath and give his knees a rest. Id. His doctor told him it would be good to lose weight but weight loss would not help with his knee pain much (Tr. 55). Plaintiff had been using a cane, purchased by a friend, for about a year-and-a half for balance and to keep him from falling. Id.

Plaintiff was collecting unemployment asserting he was "ready, willing, and able" to work and he was going to the career center (Tr. 56). He also testified that if someone had offered him a job, he would have taken it. Id. He also gets food stamps but does not have health insurance (Tr. 58).

Vocational expert (VE), Lisa Courtney, also testified (Tr. 64). She classified Plaintiff's prior work in restaurants as mostly light work, and mostly unskilled jobs (Tr. 65). The ALJ asked:

> All right, let's assume a person has the claimant's age, educational background, and work experience. My first exhibit [sic] – or first hypothetical is based on Exhibit 5E and 3F. This person can lift or carry twenty pounds on occasion, and ten pounds frequently; can stand and/or walk two hours each, can sit for six hours, can never climb ropes, scaffolding or ladders; can never crouch or crawl; can occasionally climb ramps and stairs; can occasionally kneel; and can frequently balance and stoop. Would this hypothetical allow for any of the past work?

Id. The VE responded that the RFC would allow the hypothetical person to do the Plaintiff's past work as a cashier and there were also a number of jobs the person could do (Tr. 66). The ALJ added:

> A second hypothetical's a variation on the first. All of the first, except this person would require a cane for balance, and would be better off with a sit/stand option. Would that affect any of the job numbers that you gave me?

(Tr. 67). The VE provided the following jobs based on the hypothetical: inspector of electrical equipment, light exertional level, specific vocational preparation (SVP) 2 (Tennessee has 1,500 jobs, United States about 55,000 jobs); bench assembly, light exertional level, SVP 2 (Tennessee 1,700 – 1,800); and sorter, light exertional level, SVP 2 (14,000 in the Region, United State has 40,000 jobs) (Tr. 66-67).

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the record contains substantial evidence that could have supported an opposite conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. E.g., Longworth v. Comm'r of Soc. Sec., 402 F.3d 591, 595 (6th Cir. 2005). Accordingly, while this court considers the record as a whole in determining whether the SSA's decision is substantially supported, it may not review the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. See Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007); Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

#### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must

"result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

> 2) A claimant who does not have a severe impairment will not be found to be disabled.

> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.

> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6ᵗʰ Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6ᵗʰ Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6ᵗʰ Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6ᵗʰ Cir. 1990). In such cases where the grids do not

direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony.  See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere.  See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C.  Plaintiff's Statement of Errors

Plaintiff first argues that the ALJ failed to properly evaluate the opinion of his treating physician, Dr. Talley.  Plaintiff contends that Dr. Talley's assessment of his physical limitations should have been accepted in light of the fact that the objective medical evidence confirms a serious impairment to plaintiff's left knee, as well as the fact that Dr. Talley was the only treating (or, for that matter, examining) source to render a functional assessment. The ALJ did recognize that plaintiff's physical impairments "are quite severe," particularly in combination with his morbid obesity (Tr. 26)  Moreover, he also recognized that Dr. Talley assessed limitations that are largely on par with the RFC finding here, and only rejected Dr. Talley's assessment to the extent of its relatively minor inconsistency with that finding.  (Tr. 27) Indeed, it appears that the only significant difference between the two is Dr. Talley's opinion that plaintiff could only sit for four, rather than six, out of the eight hours in a

workday. (Under both Dr. Talley's assessment and the RFC finding, plaintiff was capable of standing for two hours.) But for this difference, the vocational expert would have agreed that the "bench jobs" of inspector, bench assembler, and sorter, which she identified in response to the hypothetical limitations included in the RFC finding, would also have been capable of being performed under Dr. Talley's assessment. (Tr. 65-69) The ALJ rejected the assessment that plaintiff was limited to four hours of sitting during the workday, citing plaintiff's lack of any apparent difficulty with sitting throughout the nearly fifty-minute hearing (consistent with Dr. Talley's assessment that he could sit for four hours without interruption (Tr. 266)) as well as the allowance of an option to vary his position between sitting and standing in order to ease his discomfort. (Tr. 26-27) These factors, combined with the nonexamining consultants' opinion that plaintiff could sit for about six hours (Tr. 231, 261) and the items which led the ALJ to discount plaintiff's credibility as discussed below, provide sufficient evidentiary support for the limited weight given those portions of Dr. Talley's opinion which are inconsistent with the RFC finding.

Plaintiff challenges the ALJ's finding that his testimony was not fully credible, arguing that the ALJ's concern over the quantum of evidence was overstated, and that the other given reasons for this finding were insufficient. However, the undersigned finds substantial evidentiary support for the ALJ's credibility determination. In the first place, there appears to be no dispute over the sufficiency of the objective medical evidence establishing plaintiff's arthritic knees as a reasonable cause of the symptoms he complains of; the ALJ recognized the existence of "quite severe" degeneration in the left knee joint which would warrant surgical intervention if the plaintiff's body weight were sufficiently reduced to predict a successful outcome. (Tr. 26) Rather, the ALJ's concern is over the lack of

significant evidence documenting the existence of pain which endured at such levels as to be disabling, or limitations which would otherwise preclude all work activity.  As the ALJ related, the somewhat thin volume of complaints of left knee[2] pain to plaintiff's physicians is noteworthy, particularly in light of the pronounced interrelationship between plaintiff's significant knee abnormality and his chronic obesity.  (Tr. 25-26)  As of October 2009, plaintiff reported being unable to get up and down stairs or to walk very far due to the pain in his left knee, but declined an osteotomy as he was "not too excited about starting on the surgery project yet."  (Tr. 221)  He was started on the anti-inflammatory Naprosyn, but was told that significant weight loss was required before he would be a candidate for total knee replacement.  (Tr. 221, 254)  Naprosyn was discontinued in December 2009, and the narcotic Tramadol was prescribed for pain relief.  (Tr. 247)  During the remainder of his treatment at Nashville General Hospital, plaintiff was prescribed varying dosages and types of anti-inflammatory medications, as well as trials of narcotic pain medication at varying dosages (Tr. 289, 300, 332, 358), and was repeatedly advised to lose weight.  Unfortunately, despite some success with weight loss during 2010, by January 2011 the lost weight had been regained.  (Tr. 285)  Thus, plaintiff was left to seek symptomatic treatment for his chronic knee pain and its intermittent exacerbations.  (Tr. 365)

In addition to the medical record, the ALJ identified "several items that work against a finding that the claimant's impairments, even if severe, are disabling":

First is the fact that when the claimant's last work was terminated, it was for reasons unrelated to his severe impairments, but rather he was fired in

_____

[2]As noted by the ALJ, the x-rays of plaintiff's right knee joint demonstrate significantly less osteoarthritic change than is evident in his left knee.  (Tr. 25, 286, 371)

response to a customer complaint (per testimony). Second is the fact that, by the claimant's own report, he is able to carry on a number of daily activities, notwithstanding his physical impairments (see Ex. 6-E). Some of the activities, such as doing laundry, washing dishes, or cooking simple meals, require certain amounts of standing. Others can at least be done from a sitting position, such as the need to accomplish grocery shopping by means of a motorized cart. But in any event, one is dealing with a fairly robust set of activities. Indeed, all of these appear harmonious with the concept that such a person could at least perform sit-down jobs at the sedentary exertional level, and tend to undermine allegations regarding such a severe level of pain as to prevent such activities. The claimant's acceptance of unemployment insurance benefits is another factor. ... [T]his ALJ diligently inquired of the claimant regarding his receipt of unemployment benefits. And in response, the claimant testified that he continued to look for employment while he was receiving benefits. ... The claimant also asserted that he was unable to sit for significant periods of time, yet from a lay-perspective, he appeared to have no difficulty in maintaining a seated position in the course of a nearly 50-minute hearing. This cannot possibly work to persuade a reasonable fact-finder that he is unable to sit in a manner that is inconsistent with the above residual functional capacity, that is to say, something that would allow him to sit throughout the day, but also let him vary between sitting and standing postures as needed. For all of these reasons, the undersigned has concluded that neither the claimant's burden of production, nor his burden of persuasion, was satisfied in this case.

(Tr. 26-27) The ALJ further took note of plaintiff's testimony "that the reason why he considered himself to be disabled is because all or nearly all of his past experience involved work in the restaurant industry that was generally fast-paced and required a lot of ambulation, and that he would be unable to perform such jobs, especially secondary to his knee and back disorders." (Tr. 24) The ALJ also mentioned the fact that plaintiff took public transportation from his home on the morning of the hearing, walking from the nearest bus stop to the hearing office. (Tr. 23-24, 48) Especially in light of the deference that is to be accorded the ALJ's credibility finding, e.g., Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476

(6th Cir. 2003), the undersigned finds that substantial evidence supports that finding in this case.

Plaintiff claims further error in the ALJ's determination of his RFC, in that it does not account for the measures required to relieve his pain, nor does it incorporate the mental limitations assessed by Dr. Talley. However, the ALJ heard plaintiff's testimony that he had tried soaking his knees in hot water (Tr. 54), and the undersigned finds sufficient indication of the ALJ's weighing of such factors, as well as plaintiff's testimony that his pain medications put him to sleep for an hour or more after he takes them (Tr. 61-62) implicit in the ALJ's well supported credibility determination, which she reached as part of the determination of plaintiff's RFC. As to the moderate mental limitations assessed by Dr. Talley, the ALJ gave ample reasons for not giving those assessed limitations "any degree of significant weight" (Tr. 21), not least of which is the fact that plaintiff has not been diagnosed with any mental impairment. The ALJ did not err in failing to account for these items during the determination of plaintiff's RFC.

Lastly, plaintiff takes issue with the findings related to his ability to stand and/or walk, and the vocational consequences of the vagueness he identifies therein. Plaintiff complains that the ALJ improperly found him capable of performing a range of light work, when elsewhere in her rationale she concluded that his daily activities "appear harmonious with the concept that such a person could at least perform sit-down jobs at the sedentary exertional level, and tend to undermine allegations regarding such a severe level of pain as to prevent such activities." (Tr. 26) On the face of these findings, it is clear that there are no grounds for finding -- as plaintiff has asserted -- any "internal inconsistency in

19

the ALJ's decision regarding the exertional level which she found [plaintiff] capable of performing." (Docket Entry No. 14 at 24) That his daily activity level alone indicates some ability to work is not at all inconsistent with the finding that the record as a whole supports an ability to perform a reduced range of light work. Nor is there any harmful error in the ALJ's use of a hypothetical question to the vocational expert in which she described the ability to stand and/or walk two hours each (Tr. 65), compared with the RFC finding which limited plaintiff to two hours of standing/walking (Tr. 22), particularly in light of the fact that the testimony in response to that hypothetical identified jobs which could performed either sitting or standing. (Tr. 66-67) Finally, while plaintiff objects that the ALJ's inclusion of the need for "a sit/stand option" as part of her RFC finding is impermissibly vague, as it does not clarify the lengths of time plaintiff would be able to either sit or stand, it is clear to the undersigned that the finding contemplates the option to sit or stand at will, a postural mobility that the jobs identified by the vocational expert accommodate. (Tr. 67) Indeed, in response to the hypothetical which included the sit/stand option, the expert even eliminated a previously identified job which "would have to stand more" and substituted in its place a job "that could sit or stand." Id. Plaintiff's concluding argument is that the Dictionary of Occupational Titles (DOT) does not contemplate the option to sit or stand in the performance of light jobs, and thus that there exists an unexplained inconsistency between the expert's identification of available light jobs with a sit/stand option and the DOT. However, the expert clearly explained that, in identifying light jobs which could be performed by an individual who cannot stand or engage in other postural activities as long as would typically be required for their performance under the DOT description, she reduced by roughly fifty percent the available numbers of such jobs in the economy. (Tr. 66-67)

Accordingly, the ALJ rightly found no unresolved inconsistency between the expert's testimony and the DOT.  (Tr. 50)

In sum, the undersigned finds that substantial evidence on the record as a whole supports the decision of the ALJ.  That decision should therefore be affirmed.


## IV.  Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED and that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).


**ENTERED** this 27th day of January, 2016.

 s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE